UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DARREN W. HARPER,<br><br>                    Plaintiff,<br>       v.<br><br>DIEBOLD INCORPORATED, a foreign<br>corporation,<br><br>                    Defendant. | Case No. 1:12-cv-00031-BLW<br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW, AND<br>ORDER** |

## INTRODUCTION

The Court conducted a bench trial in this matter on June 25-26, 2013. The parties then submitted their post-trial briefs and proposed findings of fact and conclusions of law. The Court now enters its Findings of Fact, Conclusions of Law and Order.

## FINDINGS OF FACT

### General Background Of Diebold, Diebold's Severance Program, And Harper

1.      Diebold, Inc. manufactures, installs, and services automatic teller machines. (*Transcript of Bench Trial Conducted on June 25-26, 2013*, 34:12-18[1])

2.      Diebold expends significant time and resources training its technicians. (76:20-77:6; 118:9-14; 515:13-516:4; 521:22-523:4)

3.      Diebold hired Darren Harper as a Customer Service Engineer in Twin Falls, Idaho in July 2000. (84:13-17)

---

[1] The Court will reference the June 25-26 transcript by page and line number only for the remainder of this decision.

4.      Upon being hired, Harper received several weeks of training at Diebold's corporate headquarters in Canton, Ohio. (84:18-85:1)

5.      Most Diebold training classes are conducted at Diebold's corporate headquarters in Canton, Ohio. (516:20-24)

6.      Most Diebold training is voluntary, and service technicians pick the training they need. (94: 9-13)

7.      In February 2011, Steven Oatman, Harper's former supervisor, rated Harper's performance as "exceeds expectations." (54:16-22; Plaintiff's Exhibit No. 1003)

8.      Harper was never disciplined by Oatman during his tenure at Diebold. (91:23-25)

9.      Harper was a participant in Diebold's Separation Benefits Plan ("the Plan"). (106:20-107:2; Joint Exhibit No. 1)

10.     Diebold's Benefits Committee is the administrator of the Plan. (436:22-437:4; Joint Exhibit No. 1 at ¶9)

11.     As the administrator, the Benefits Committee has all powers necessary to determine all questions concerning the administration of the Plan, including questions of eligibility and the amount of any benefits payable under the Plan. (436:22-437:4; Joint Exhibit No. 1 at ¶9)

12.     According to the Plan, to be eligible for benefits an employee must (1) be at least part-time (20 or more hours per week) and a non-bargaining associate, (2) who was involuntarily terminated as a result of a merger, acquisition, or sale or position

elimination, and (3) who signs a separation agreement and release. (437:24-438:9; 438:19-440:4; Joint Exhibit No. 1 at ¶3)

13.    The Plan gives Diebold sole discretion to determine whether an associate meets the eligibility requirements for benefits under the Plan. (440:9-18; Joint Exhibit No. 1 at ¶3)

14.    A company representative, usually someone in the human resources department, determines whether an associate is eligible for benefits under the Plan. (440:19-24)

15.    Severance benefits are calculated based upon an associate's monthly salary, not including overtime pay, commissions or bonuses. (446:4-14; Joint Exhibit No. 1 at ¶5(a))

16.    Separation benefits for an employee with at least 10, but less than 15, years with the company are equal to 4-months pay. (Joint Exhibit No. 1)

### Events Leading Up To Harper's Suspension

17.    Harper volunteered to attend a VAT 40 training class scheduled to take place in June 2011 in Canton, Ohio. (99:11-19; 121:3-9; 210:9-11)

18.    On May 20, 2011, Rebecca Chase, an employee in Diebold's corporate travel department in Canton, contacted Harper to make his travel arrangements to attend the training. (122:20-22; 125:21-22; 160:11-13)

19.    Harper wanted to fly to Canton from Twin Falls, Idaho instead of Boise, Idaho because of cost, safety and convenience issues. (177:21-178:6; 239:19-240:5)

20.     Chase told Harper that she could not authorize him to fly out of Twin Falls.
        (127:18-20)

21.     Harper indicated that he would rather cancel the training class than fly out of
        Boise. (128:15-19; 242:25-243:5)

22.     Shortly thereafter, Harper contacted Larry Samp, Idaho team leader for Diebold,
        seeking assistance regarding the travel issue. (135:3-7)

23.     Samp told Harper that Dean Thomas was assisting Oatman, who had been on a
        leave of absence since December 2010. (135:11-15; 136:15-18; 225:14-226:7)

24.     In 2011, Thomas had assumed the position of acting Customer Solutions Manager
        in Idaho during Oatman's leave. (269:6-13)

25.     Harper asked Samp to ask Thomas to call him. (135:15-16)

26.     Thomas called Harper approximately 10-15 minutes later. (136:23-24)

27.     Harper told Thomas that it was cheaper and safer for him to fly to Canton from
        Twin Falls than from Boise but the travel department still wanted him to fly out of
        Boise. (137:25-138:7)

28.     After explaining the travel issue, Harper told Thomas that there was a big morale
        problem at Diebold. (232:8-12; Joint Exhibit No. 3)

29.     Harper told Thomas that there were competitors trying to hire Diebold technicians,
        including himself. (232:13-22; 233:15-21; 234:17-22; Joint Exhibit No. 3)

30.    Harper told Thomas that the travel issue was the type of thing that when a

competitor approaches a Diebold technician, it will make the technician entertain

an offer from the competitor. (237: 15 – 238: 11)

31.    Thomas testified that Harper told Thomas that he was just waiting for the

competitors to get the dollars and the time right to make it easier for him to leave

Diebold. (280:25-281:6; 288:13-17; 300:25-301:4)

32.    Thomas also testified that Harper also told him that it was issues like the current

travel situation that made it easier for him to jump ship or move to a competitor.

(324:24-325:9)

33.    Thomas testified that he contacted Chase to discuss the travel issue, and Chase

told him that Harper was aggressive or abrasive because he was dissatisfied that he

was unable to fly out of Twin Falls. (277:15-25; 278:4-12)

34.    Thomas contacted Kelly Rackley in Diebold's human resources department and

Arden McGinnis, Regional Solutions Manager for the mountain region, for

guidance regarding Harper. (272:14-19; 281:13-19; 282:3-6; 326:2-7)

35.    Thomas told McGinnis that Harper was unwilling to fly out of Boise to attend

training in Canton, and that he had threatened to leave the Company if a

competitor got the dollars right. (523:17-524:17; 526:21-527:5)

36.    Thomas informed McGinnis that Tony Huston, acting Job Site Coordinator, had

told Thomas that Harper had made similar ongoing threats and comments about

leaving Diebold for a competitor. Thomas further informed McGinnis that Huston

believed Harper would leave his employment with Diebold if the time and price were right for him. (291:17-292:18).

37.   McGinnis was bothered by Harper's comments to his manager, and considered such conduct to be a terminable offense. (524:7-525:1; 555:23-556:8)

38.   McGinnis' was concerned about Harper's threat to leave the Company. (525:20-526:2)

39.   In a Sunday, May 22, 2011 email to Thomas, Harper told Thomas, "I have not cancelled the class as of now so let me know what you find out and if I have to fly out of Boise cancel the class for me." (Joint Exhibit No. 5)

40.   On Monday, May 23, 2011, Thomas informed Harper that Diebold's corporate travel department would not approve the cost of the airline ticket for Harper to fly to Canton from Twin Falls. (163: 14-24; Joint Exhibit No. 6).

41.   McGinnis asked Thomas to follow up by sending McGinnis an email and Thomas did so on May 23, 2011. (283:15-19; 526:3-20; Joint Exhibit No. 6)

**Harper's Suspension**

42.   McGinnis decided to suspend Harper. (294:13-16; 405:20-24; 533:20-534:2)

43.   McGinnis testified that his decision to suspend Harper was unrelated to the cost of travel to Canton from either Twin Falls or Boise. (299:9-18)

44.   McGinnis testified that Harper's subsequent willingness to fly out of Boise after Harper's initial conversations with Thomas was immaterial to McGinnis' decision

to suspend Harper in light of Harper's prior threat to leave the Company. (528:24-529:12)

45. McGinnis testified that the decision to suspend Harper pending investigation was intended to provide a cooling off period and "make [Harper] think about it." (535:3-10)

46. By suspending him, McGinnis testified that he wanted to give Harper another reason to think about leaving Diebold to go work for a competitor. (534:13-535:2)

47. In a May 24, 2011 email to Rackley, McGinnis asked her to "1) Remove Wilkes from the 'list' and substitute the canceled ESP (Kytia) requisition from [Washington/Alaska] in his place. 2) Provide a written warning to Mr. Harper with a (3) day suspension starting tomorrow for insubordination. 3) [And] Cancel his VAT 40 class immediately." (Joint Exhibit 6)

48. He ended his email by stating, "Let's make the timing right for him. I have little patience for this type of crap. Kelly [Rackley], your thoughts?" (Joint Exhibit 6)

49. Rackley testified that she understood McGinnis' instruction to mean that since the company canceled the requisition for the electronic security production position for which Kytia was a candidate, she was to remove Wilkes from the reduction in force list. (406:18-407:15; 530:17-531:11; Joint Exhibit No. 6)

50. Rackley testified that she understood McGiniss' statement, "Let's make the timing right for him," to mean that McGinniss was considering terminating Harper. (414:3-7)

51.     Rackley testified that in a follow-up conversation to the email between herself and McGinnis, McGinniss stated, "Let's get him suspended, Let's, you know, possibly terminate. It was I want him out." (414: 20-22)

52.     Rackley then prepared the notice of suspension. (414: 23-25)

53.     Rackley prepared multiple drafts of the suspension notice to be delivered to Harper based upon the information gathered during the company's investigation. (414:23 – 429:16)

54.     Rackley testified that two specific portions of the final draft of the suspension notice were included as the reasons for the suspension – that Harper was just waiting for a competitor to get the dollars right before leaving Diebold, and that he would refuse training in the future if he could not secure a flight out of Twin Falls. (428: 3-13; Joint Exhibit No. 9)

55.     On Wednesday, May 25, 2011, Diebold suspended Harper pending investigation. (Joint Exhibit No. 9).

## Harper's Termination

56.     Diebold terminated Harper on June 1, 2011. (Joint Exhibit No. 14)

57.     McGinnis made the decision to terminate Harper. (535: 116-18)

58.     McGinnis gave the following reasons for terminating Harper,

a.     "It was based on his [Harper's] decision – on the comment that he was planning to go to a competitor, the comment that he was having such a hard time with his new manager, seemed like he was being very aggressive with

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER - 8**

Dean [Thomas], trying to back him into a corner, trying to put him in his place, as it were, as his new manager. I just won't tolerate that in my organization;" (536: 16-23)

b. Because of "[Harper's] statement to Dean Thomas, who is my trusted manager, that said that he planned to leave the company anyway; the fact that he was very insubordinate with him; the fact that he had threatened this to Dean. I thought that was inappropriate, and that's why I made the decision to go ahead and terminate." (535: 21 – 536: 3)

59. In deciding to terminate Harper, McGinnis testified that he did not consider any cost savings to the Company by terminating him for cause. (550:22-551:5)

60. Notably however, Thomas acknowledged during trial that he had misinformed McGinnis.

61. Thomas testified that he misrepresented his conversation with Harper when he told McGinnis that Harper was just waiting to jump ship and leave Diebold. (343: 1-14; 343: 1-14)

62. And Thomas admitted that McGinnis' decision to terminate Harper was based upon the misinformation he gave McGinnis. (347:7 – 348:3)

63. Additionally, while drafting Harper's suspension letter, Rackley sent an email to Thomas on May 24 indicating that she had contacted Chase and her supervisor, and that "neither one indicated there was an issue with [Harper's] behavior. They both stated that he was very matter of fact and told them 'I guess if I can't fly out

of Twin Falls that I'll cancel the training.' We'll need to strike portion that [sic] from the write-up." (Joint Exhibit No. 7)

64.   Moreover, just before McGinnis terminated Harper, Harper's long-time supervisor, Oatman, sent McGinnis an email indicating that customers loved Harper and he is good at fixing the equipment. (Joint Exhibit No. 13)

65.   Oatman explained that Harper was "a self starter and you never have to worry about him not working. Not sure if you need anything on this from me or not." (Joint Exhibit No. 13)

66.   Diebold does not have a formal progressive discipline policy; however progressive discipline is referenced in multiple company policies for Diebold. (496:6-497:5)

67.   Rackley testified that progressive discipline was not issued to Harper due to the egregious nature of his misconduct. (497:9-12; 547:8-12)

68.   At the time of his termination, Harper had worked for Diebold for approximately 11 years, and his annual base salary was $4,000 per month. (Joint Exhibit Nos. 15, 16 and 18)

**Diebold's Reduction In Force**

69.   In 2011, Diebold needed to reduce its costs so it decided to implement a Reduction in Force ("RIF"). The Company planned to reduce the associate headcount in the Idaho district by three technicians. (531:12-532:9)

70.   McGinnis and the business teams selected the employees included in the RIF. (408:1-22; 539:1-6)

71.   McGinnis was the ultimate decision maker regarding which employees were selected for the RIF in accordance with management requirements. (531:23-532:1)

72.   Factors considered when selecting employees for inclusion in the RIF were performance, seniority (last in, first out), and skill sets in particular geographic areas. (62:11-22; 444:20-445:6; 538:2-25)

73.   The RIF list changed until the last minute in order to vet the employees selected for the RIF and take into consideration mitigating factors. (537:16-538:1)

74.   Rackley controlled the data and administered McGinnis' instructions with regard to the RIF list. (410:23-411:3)

75.   McGinnis testified that he never considered Harper for the RIF. (555:2-8)

76.   Harper's name was never placed on the RIF list. (445:11-13; 539:21-24)

77.   Oatman was initially involved in selecting employees for inclusion in the RIF before he went on a leave of absence. Oatman selected three employees – Richard Wilke, Roger Prang, and Eugene Zito – for inclusion in the RIF. (73:9-24; 408:23-409:2)

78.   Oatman did not select anyone from Harper's team for inclusion in the RIF. (74:10-14)

79.   McGinnis made the decision to remove Zito from the RIF list and add Koch to the list. (433:20-435:7)

80.   McGinnis testified that he subsequently decided to remove Koch from the RIF list because after Harper was terminated for cause, Diebold would have been

shorthanded in Twin Falls if it would have proceeded with eliminating Koch's position. The Company would have had to rehire Koch if it had proceeded with terminating him as part of the RIF when it terminated Harper for cause. (540:11-541:2).

81.   If Koch would have been terminated as part of the RIF, he would have received separation benefits representing two months' salary in the amount of approximately $6,500-$7,000. (446:23-448:11)

82.   If Harper would have been terminated as part of the RIF, he would have received separation benefits in the amount of approximately $17,000. (454:25-455:3)

83.   Diebold terminated Harper before it implemented the RIF. (369:5-7; 539:17-20)

84.   Prang and Wilke were terminated as part of the RIF. (435:5-7; 473:21-22)

**Harper's Request For, And Diebold's Denial Of, Separation Benefits**

85.   After his termination, Harper sent a letter to Rackley and a letter to the Benefits Committee requesting separation benefits under the Plan. (440:25-441:8: Joint Exhibit Nos. 15-16)

86.   Upon receipt of Harper's letter requesting benefits under the Plan, the Benefits Committee forwarded the letter to HR Manager Kim Hays. Hays contacted Rackley regarding the reasons for Harper's termination. (441:8-19)

87.   Harper was a full-time non-bargaining associate. (438:10-16)

88.     Hays and Rackley jointly decided that Harper was not eligible for benefits because

        he was terminated for cause for insubordination. (441:20-442:15; 443:20-444:6;

        500:6-16)

89.     By letter dated July 13, 2011, Rackley notified Harper that he was ineligible for

        benefits under the Plan because he was terminated for cause. (450:1-19; Joint

        Exhibit No. 17)

90.     This lawsuit followed.

                            **CONCLUSIONS OF LAW**

1.      "ERISA is a comprehensive statute designed to promote the interest of employees

        and their beneficiaries in employee benefit plans." *Ingersoll-Rand Co. v.*

        *McClendon*, 498 U.S. 133, 136 (1990) (internal citation omitted).

2.      An ERISA plan administrator's denial of benefits is reviewed under a *de novo*

        standard unless the benefit plan gives the administrator discretionary authority to

        determine eligibility for benefits or to construe the terms of the plan. *Montour v.*

        *Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009).

3.      Where the plan does grant discretionary authority, courts must review the

        administrator's decision for abuse of discretion. *Id.*

4.      The manner in which a court applies the abuse of discretion standard is affected by

        whether the administrator has a conflicting interest. *Id.*

5.      But if there is no conflict – such as where the same entity which funds the ERISA

        benefits plan also evaluates claims – review of the plan administrator's benefits

determination involves a straightforward application of the abuse of discretion standard. *Id.*

6.      "In these circumstances, the plan administrator's decision can be upheld if it is grounded on any reasonable basis." *Id.* (Internal citation and quotation omitted).

7.      Here, the plan granted the plan administrator discretionary authority.

8.      Paragraph 3 of the Plan states,

(b) Conditions of Separation

> (i)     The employee's employment is involuntarily terminated by the Company;
>
> and
>
> (ii)    (A) the termination of employment is the result of a sale or a merger of all or part of Diebold's business and/or assets, an acquisition, or another form of corporate transfer, divestiture, outsourcing, subcontract, or similar transaction, and as a result the employee is not offered a position by the Company, the acquiring company or another entity related to the transaction; or
>
> (B) the termination of employment is unrelated to the type of transaction described in paragraph 2 (a) above, and instead is due to a change in operations, a facility relocation or closing, or a reduction for other economic reasons, and the employee did not refuse or otherwise fail to accept another position that may be made available with the Company.
>
> and
>
> (iii)   The employee agrees to a separation agreement and release, and non-competition agreement if applicable, as determined by the Company.

> The Company will determine, in its sole discretion, whether the eligibility requirements described in Section 3, above, have been met in any given situation. (Joint Ex. 1, ¶ 3).

9.  As an exception, the Plan further states,

> (a) Employees who are involuntarily terminated for cause, as determined by the Company in its sole discretion, are not eligible for separation benefits under this plan. Some examples of termination "for cause" include poor job performance, excessive absenteeism, insubordination and violation of any Company policy or procedure that results in termination of employment. (Joint Ex. 1, ¶ 4).

10. There is no evidence of any conflict of interest in this case.

11. Accordingly, the Court will apply the abuse of discretion standard in a straightforward fashion. *Montour*, 588 F.3d at 629.

12. Therefore, the plan administrator's decision will be upheld if it is grounded on any reasonable basis. *Id.*

13. Making that determination in this case boils down to whether McGinnis terminated Harper for cause, making Harper ineligible for severance benefits – if he did, the plan administrator made the right call to deny benefits; if he did not, the plan administrator was wrong.

14. So, did McGinnis really terminate Harper for cause as suggested by Diebold?

15. To answer that question the Court must look at the reasons given by McGinnis for terminating Harper.

16. Specifically, McGinnis testified that he terminated Harper for the following reasons,

a.     "It was based on his [Harper's] decision – on the comment that he was

planning to go to a competitor, the comment that he was having such a hard

time with his new manager, seemed like he was being very aggressive with

Dean, trying to back him into a corner, trying to put him in his place, as it

were, as his new manager. I just won't tolerate that in my organization;"

(536: 16-23)

b.     Because of "[Harper's] statement to Dean Thomas, who is my trusted

manager, that said that he planned to leave the company anyway; the fact

that he was very insubordinate with him; the fact that he had threatened this

to Dean. I thought that was inappropriate, and that's why I made the

decision to go ahead and terminate." (535: 21 – 536: 3)

17.     Essentially, then, the reasons for termination are two-fold: (1) Harper's alleged

statement to Thomas (whom McGinnis apparently fully trusted) that Harper

intended to leave Diebold for a competitor; and (2) Harper's insubordination

toward Thomas – that is, that Harper had threatened Thomas with leaving Diebold

for a competitor and was aggressive toward him.

18.     A close look at the evidence supporting these assertions is troubling.

19.     Most importantly, it appears McGinnis' trust in Thomas was misplaced.

20.     Thomas gave the following testimony at trial:

a.     QUESTION: . . . you told Arden [McGinnis] that Darren [Harper] was just

waiting to leave Diebold?

b.   ANSWER: I said that Darren [Harper] made the statement that he was

getting ready to jump ship or move to a competitor or whatever I said. (334:

19-23)

* * *

c.   QUESTION: And then you said, "And he will be jumping ship." He didn't

tell you he was going to jump ship, did he?

d.   ANSWER: No. He said it would make his decision easier to jump ship.

e.   QUESTION: But you told him . . .

f.   ANSWER: . . . or move to a competitor.

g.   QUESTION: You told Arden [McGinnis] he would be jumping ship.

h.   ANSWER: Okay.

i.   QUESTION: And that was a misrepresentation wasn't it?

j.   ANSWER: Yes, sir. (343: 1-14)

* * *

k.   QUESTION: And would you agree that Arden's decision was based on

what you had told Arden?

l.   ANSWER: One previous phone conversation and an email, yes, sir.

m.   QUESTION: And at this point, was Kelly involved in the discipline of Mr.

Harper?

n.   ANSWER: She was involved in the email, the talking, and the creation of

the suspension letter; yes, sir.

o.  QUESTION: So do you know if Kelly and Arden are also talking about Darren [HARPER]?

p.  ANSWER: "Provide a written warning to Mr. Harper with a three-day suspension starting tomorrow for insubordination." I believe so, yes, sir.

q.  QUESTION: And the information that they had all came from you; true?

r.  ANSWER: True.

s.  QUESTION: You were the one disseminating the information, and they were relying on what information you told them?

t.  ANSWER: Yes, sir. (347:7 – 348:3)

21. Thus, McGinnis' relied upon misrepresentations from Thomas as his main reason for terminating Harper – i.e., that Harper threatened to leave Diebold for a competitor.

22. Likewise, it is hard to believe that Harper was "aggressive" toward Thomas regarding his threat to leave Diebold when no such threat was actually made.

23. Moreover, Thomas' statement that Harper was aggressive with travel personnel was uncorroborated; in fact it was denied by travel personnel. (Joint Exhibit No. 7)

24. Accordingly, the reasons given by McGinnis for terminating Harper for cause were untrue at best; at worst, they were fabrications.

25. One could argue that McGinnis nevertheless terminated Harper for these reasons because he had no reason not to believe Thomas.

26.  However, after Harper's suspension, but before his termination, Harper contacted Oatman for help.

27.  In response, Oatman sent the following email to McGinnis, Rackley and Thomas, "All, I'm not sure what to do with this. Darren [Harper] has been calling me and I have been telling him that I do not know what is going on with this and do not have any info for him. I know that Darren's style is a little gruff but the customers love him and he is good at fixing the equipment. He is a self starter and you never have to worry about him not working. Not sure if you need anything on this from me or not." (Joint Exhibit No. 13)

28.  At the very least, this note from Harper's long-time supervisor, coupled with the uncorroborated statements by Thomas regarding travel personnel, should have given McGinnis pause and reason for further investigation.

29.  This is even more troubling given Diebold's lack of a formal progressive discipline policy (496:6-497:5), and its decision to forego any progressive discipline with Harper because his conduct was too "egregious." (497:9-12; 547:8-12)

30.  The bottom line is the reasons given by Diebold for terminating Harper for cause simply do not add up. By all accounts, Harper was a well-trained employee who was good at his job, and who had no significant disciplinary problems before the alleged incident surrounding the travel issue. Perhaps Harper's conduct invited an oral warning, but it certainly was not so "egregious" that it justified immediate

termination in the face of his service to the company and the strong support which Harper had from his long-time supervisor. Simply put, the stated reason for termination is implausible.

31. Moreover, during difficult financial times for Diebold, the financial incentives for terminating Harper for cause at that point were significant – avoiding severance benefits, avoiding unemployment payments, and ridding itself of Harper's higher salary given his tenure with the company.

32. Diebold terminated Harper, which resulted in Diebold only having to lay off two instead of three other employees under the RIF. (369:5-7; 539:17-20; 435:5-7; 473:21-22)

33. Therefore, it was not reasonable to deny Harper separation benefits pursuant to the Plan's language that employees who are involuntarily terminated for cause are not eligible for separation benefits. (Joint Ex. 1, ¶ 4).

34. The Court therefore concludes that even under the abuse of discretion standard, the plan administrator's decision was wrong because the evidence overwhelmingly indicates that Harper was not really terminated for cause because of insubordination.

35. The only reasonable conclusion is that Thomas' embellished, if not fabricated, stories about Harper were an attempt to terminate Harper without having to pay him severance benefits.

36. Accordingly, Harper is entitled to 4-month's pay, which equals $16,000.

37.   Harper is also entitled to prejudgment interest.

38.   "A district court may award prejudgment interest on an award of ERISA benefits at its discretion." *Blankenship v. Liberty Life Assur. Co. of Boston,* 486 F.3d 620, 628 (9th Cir. 2007).

39.   "Generally, the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Id.* (Internal citation and quotation omitted.)

40.   Here, prejudgment interest is necessary to compensate Harper for the time value of money from the date he of his termination, June 1, 2011, until the date of Judgment, and there is no reason to deviate from the statutory rate.

41.   Accordingly, Harper is entitled to judgment in the amount of $16,000 plus interest at the rate prescribed under 28 U.S.C. § 1961.

## ORDER

**IT IS ORDERED:**

1.   Plaintiff's claim is **GRANTED**. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: October 28, 2013

B. Lynn Winmill
Chief Judge
United States District Court